**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jody Alan Jones, | No. CV-16-0383-TUC-BGM |
| Plaintiff, | |
| v. | **ORDER** |
| Nancy A. Berryhill,<br>Acting Commissioner of Social Security, | |
| Defendant. | |

Currently pending before the Court is Plaintiff's Opening Brief (Doc. 20). Defendant filed her Brief ("Response") (Doc. 21), and Plaintiff filed his Reply Brief ("Reply") (Doc. 22). Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g). Compl. (Doc. 1). The United States Magistrate Judge has received the written consent of both parties, and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure.

. . .

. . .

. . .

# I.    BACKGROUND

## A.    *Procedural History*

On September 4, 2013,[1] Plaintiff filed a Title II application for Social Security Disability Insurance Benefits ("DIB") alleging disability as of September 4, 2012 due to chronic obstructive pulmonary disease ("COPD"), degenerative joint disease, polyneuropathy, peripheral artery disease ("PAD"), kidney disease, colon disease, personality disorder, and mood disorder. *See* Administrative Record ("AR") at 20, 22, 26, 40, 42, 44, 59–61, 73–75, 92, 97, 149, 161, 164, 196, 214, 242. Plaintiff's date last insured is December 31, 2017. *Id.* at 20, 22, 40, 60, 74, 161, 196, 214. The Social Security Administration ("SSA") denied this application on January 7, 2014. *Id.* at 20, 59–72, 92–95. Plaintiff filed a request for reconsideration, and on September 22, 2014, SSA denied Plaintiff's application upon reconsideration. *Id.* at 20, 73–88, 96–99. On October 20, 2014, Plaintiff filed his request for hearing. *Id.* at 20, 100. On September 10, 2015, a hearing was held before Administrative Law Judge ("ALJ") Laura Speck Havens. AR at 20, 37–58. On December 11, 2015, the ALJ issued an unfavorable decision. *Id.* at 17–31. On February 2, 2016, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on April 22, 2016, review was denied. *Id.* at 1–3, 14–16. On June 21, 2016, Plaintiff filed this cause of action. Compl. (Doc. 1).

. . .

---

[1] In her opinion, the Administrative Law Judge ("ALJ") states that the claimant applied for benefits on September 4, 2013; however at the hearing she noted the date as September 6, 2013. AR at 11, 40. The various forms and summaries contained in the record are inconsistent and indicate application dates of September 4, 2013 and September 6, 2013. AR at 11, 40, 59, 73, 149, 242.

### B.   Factual History

Plaintiff was fifty-one (51) years old at the time of the administrative hearing and forty-eight (48) at the time of the alleged onset of his disability.  AR at 41, 59–60, 73–74, 125, 136, 139, 149, 161, 196, 242.  Plaintiff graduated from high school and completed approximately two (2) years of college.  *Id.* at 41, 59, 73, 165.  Prior to his alleged disability, Plaintiff worked as a bank teller and a hair stylist.  *Id.* at 44, 166, 174–78, 216, 242.

### 1. Plaintiff's Testimony

#### a. Administrative Hearing

At the administrative hearing, Plaintiff testified that he lives alone in a house.  AR at 44.  Plaintiff further testified that he typically wakes up between seven (7) and eight (8) in the morning, and is able to dress and bathe himself without help.  *Id.*  Plaintiff also testified, however, that because he cannot sit all the way down in the tub, but cannot stand up either, bathing requires him to sit on a bucket that he has placed in the bathtub.  *Id.* at 44–45.  Plaintiff testified that his house is a "pig sty," but that he does cook, use the dishwasher, and use a dust mop.  *Id.* at 45.  Plaintiff also stated that he can do small loads of laundry and grocery shops twice a month.  *Id.*  Plaintiff testified that he does not do any yardwork or gardening.  AR at 45.  Plaintiff further testified that neighbors come over every three (3) to four (4) days to check on him and help him with his chores.  *Id.* at 46.

Plaintiff testified that he does not have any hobbies, but does watch television.  *Id.*  Plaintiff further testified that he keeps the television on for noise.  *Id.*  Plaintiff testified

that he tries to walk for exercise, and can do so for approximately ten (10) minutes. *Id*. at

46, 49. Plaintiff stated that he cares for his dog, a Labrador mix, but does not take him

out for walks. *Id*. at 51. Plaintiff also testified that he has a driver's license, and can

drive for approximately thirty (30) minutes to an hour before he has to get up and out.

AR at 46–47.

Plaintiff testified that he helps his mother at her ice cream parlor/coffee

shop/bookstore for approximately ten (10) hours per week and volunteers at the food

bank for approximately two (2) hours per week. *Id*. at 42–43. Plaintiff further testified

that he tries to go to his mother's shop every other day, and he sits and chats with people.

*Id*. Plaintiff noted that although he can read, he has trouble with smaller, continuous

print. *Id*. at 41–42. Plaintiff also stated that he can do simple addition and subtraction

with a calculator. *Id*. at 42. Plaintiff also testified that while at these jobs he can stand

for approximately twenty (20) minutes, and then needs to sit down for about ten (10) to

fifteen (15) minutes with his feet up. AR at 43. Plaintiff testified that his mental health

issues prevent him from being in close proximity of people. *Id*. at 51–52. Other than

these outings, Plaintiff does not go to church, see friends out, or do any other activities

outside of his home. *Id.* at 47.

Plaintiff confirmed that he has been diagnosed with polyneuropathy, COPD,

degenerative joint disease, kidney disease, colon disease, peripheral artery disease, liver

disease, mental health issues, mood and personality disorder, and bipolar disorder. *Id*. at

44. Plaintiff also confirmed that his previous work included being a bank teller, a

hairstylist, and a hotel registration clerk. *Id*. Plaintiff indicated that he does not have any

problems eating or sleeping.  AR at 47.  Plaintiff confirmed that his currently prescribed medications include duloxetine, mag oxide, clopidogrel, bupropion, metoprolol, gabapentin, amiodarone, potassium, buspirone, gemfibrozil, quetiapine, and lovastatin.  *Id.* at 49.  Plaintiff testified that the medication side effects include dizziness, fatigue, and confusion.  *Id*.  Plaintiff does not, however, have any problems eating or sleeping.  *Id*. at 47.

Plaintiff estimated that he could walk or stand for approximately ten (10) minutes, and can sit for between thirty (30) and forty-five (45) minutes at a time.  *Id*. at 49–50.  Plaintiff qualified that when he sits, he reclines with his feet up.  AR at 53.  Plaintiff testified that the most he can lift is less than twenty (20) pounds, and only once in a day.  *Id*. at 50, 52, 53.  Plaintiff further testified that he feels pain across his back, in his hips, his right leg, and feet.  *Id*.  Plaintiff stated that the pain is constant, estimating it to average between five (5) and six (6) on a scale of one (1) to ten (10), with ten being the very worst level of pain.  *Id*.  Plaintiff also testified that he has shortness of breath, which occurs after walking, lifting, loading the dishwasher, and putting the lead on his dog.  *Id*. at 51.

Plaintiff described his depression or bipolar disorder symptoms to include frustration, thoughts of suicide, paranoia, inability to trust people, and a desire to be left alone.  *Id*. at 52.

**b. Administrative Forms**

On November 22, 2013, Plaintiff completed a Function Report—Adult in this matter.  He indicated that he lived by himself in a house.  AR at 179.  Plaintiff described

constant pain and swelling in his limbs preventing him from standing, walking, or lifting. *Id*. Plaintiff further described that he has difficulty remembering or focusing; is irritable; angry; distrustful; and unable to be around people. *Id*. Plaintiff described his day as waking up; playing with his cat; feeding and watering his animals; and visiting with his mom and friends. *Id*. at 180. Plaintiff does not care for any people, but does care for pets, which includes feeding and watering them. *Id*. Plaintiff stated that due to his illnesses, he can no longer vacuum, do other chores, or shop. *Id*. Plaintiff also noted that without medication he is unable to sleep. AR at 180.

Plaintiff reported no problems with personal care, but noted that he has to set an alarm on his phone to remind him to take his medication. *Id*. at 181. Plaintiff stated that he prepares his own meals every day, but went from cooking from scratch to microwave meals. *Id*. Around the house, Plaintiff dusts and does light chores approximately once per month. *Id*. at 182. Plaintiff goes out daily, and can drive and ride in a car. *Id*. Plaintiff stated he shops for groceries and personal supplies in stores approximately once per month for between two (2) and three (3) hours. AR at 182.

Plaintiff stated that he is able to pay bills, count change, and use a checkbook or money orders, but is unable to handle a savings account. *Id*. at 183. Plaintiff noted that since becoming ill, his ability to handle money has changed in that it goes away quickly. *Id*. Plaintiff stated that he watches movies daily for recreation. *Id*. Plaintiff used to walk and hike or read, but he is now unable to do so. *Id*. Plaintiff's social activities include spending time with his mother at her shop and neighbors checking in on him. AR at 183. Plaintiff noted that he prior to his illness he went out, but now he cannot be around

people and does not trust them.  *Id*. at 184.

Plaintiff reported that his illnesses affect his ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, remember, complete tasks, concentrate, understand, follow instructions, use his hands, and get along with others.  *Id.*  Plaintiff estimated that he can walk for approximately 100 feet before needing to rest, and requires twenty (20) to thirty (30) minutes of rest before he can resume walking.  *Id*.  Plaintiff further reported that he can pay attention for approximately five (5) to ten (10) minutes, does not finish what he starts, and cannot follow written or spoken instructions well.  *Id*.  Plaintiff also noted that he does not get along with authority figures, and has previously been fired or laid off due to problems getting along with others.  *Id.* at 185.  Plaintiff reported that he does not handle stress or changes in routine well, and has an unusual fear of crowds and vehicles on the road.  *Id*.  Plaintiff indicated that he requires a cane, as well as glasses, every day.  AR at 185.

On the same date, Plaintiff completed a Work History Report.  Plaintiff listed his jobs prior to the alleged onset of his disability to be that of registration clerk at a hotel, bank teller, and hairstylist and salon manager.  *Id.* at 174.  Plaintiff reported that as a registration clerk he provided billing information to clients and secured payment.  *Id.* at 177.  Plaintiff further reported that this job required technical knowledge or skills and he wrote or completed reports.  *Id*.  Plaintiff also reported that he walked; stood; sat; stooped; kneel; crouched; handled both big and small objects; and frequently lifted less than ten (10) pounds.  *Id*.  Plaintiff reported that as a bank teller he used machines, tools, or equipment; technical knowledge or skills; and wrote or completed reports.  AR at 175.

Plaintiff further reported that in this position he walked; stood; sat; crouched; handled both big and small objects; frequently lifted fifty (50) pounds; and supervised others. *Id.* Plaintiff reported that as a stylist and manager he provided customer service; did the scheduling; ordered supplies; and managed employees in four (4) salons across three (3) states. *Id.* at 176. Plaintiff described his job is requiring the use of equipment; technical knowledge or skills; and writing or completing reports. *Id.* Plaintiff further reported the job required him to walk; stand; crouch; handled both large and small objects; and frequently lift more than fifty (50) pounds. *Id.*

### 2. Vocational Expert Ann Wallace's Testimony

Ms. Ann Wallace testified as a vocational expert at the administrative hearing. AR at 20, 54. Ms. Wallace described Plaintiff's past work as a beautician, Dictionary of Occupational Titles ("DOT") number 332.271-010, as light exertion, skilled work, and a Specific Vocational Preparation ("SVP") of 6. *Id.* at 54. Ms. Wallace described Plaintiff's other past work as a teller, DOT number 211.362-018, light work, SVP of 5, skilled. *Id.* Ms. Wallace described Plaintiff's third past work position as a registration clerk or desk clerk, DOT number 238.367-038, as light work, SVP of 4, semi-skilled. *Id.*

The ALJ asked Ms. Wallace about a hypothetical individual with the same age, education, and vocational background as Plaintiff. *Id.* at 55. The ALJ asked Ms. Wallace to describe any past work or other work for such an individual, with the additional limitations of being able to "sit six hours out of an eight-hour day, stand six hours out of an eight-hour day, walk six hours out of an eight-hour day; can occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds; can occasionally climb stairs, never climb

ladders; and has environmental limitations of the following — can have only occasional exposure to heights, chemicals, dust, fumes, and smoke[,] [o]ccasional is defined as very little to one-third of the time; it never is defined as no useful ability." AR at 55. Ms. Wallace testified that such an individual would be able to do the jobs of hair salon worker, a teller, and a hotel clerk — Plaintiff's past relevant work. *Id.* at 56. Ms. Wallace further testified that her testimony was consistent with the DOT. *Id.*

Plaintiff's counsel asked Ms. Wallace about the availability of jobs for a hypothetical person who could "never climb ladders, ropes, or scaffolds, c[ould] stand or walk less than two hours out of an eight-hour day, c[ould] sit less than two hours out of an eight-hour day; c[ould] never do any handling, less than two hours of fingering out of an eight-hour day; c[ould] lift or carry 10 pounds less than two hours out of . . . [an] eight-hour day[;] . . . c[ould] never carry greater than 20 pounds; and will need to be able to take additional rest breaks, more than what is typically required, and will need to lie down throughout an eight-hour day." *Id.* at 57. Ms. Wallace testified that there would be no jobs for such a person. *Id.*

### 3. Lay Witness Testimony

On November 22, 2013, Phyllis Durden, Plaintiff's mother, completed a Function Report—Adult—Third Party. AR at 188–95. Ms. Durden reported that she spends approximately six (6) hours per day visiting with Plaintiff. *Id.* at 188. Ms. Durden further reported that Plaintiff lives alone in a house, and she did not know what he does from the time he wakes up until he goes to bed. *Id.* Ms. Durden stated that Plaintiff cares for one (1) dog and two (2) cats without help. *Id.* at 189. Ms. Durden reported that prior

to Plaintiffs illnesses, "he was able to work 2 jobs, used to be energetic & helpful to others[.]" *Id*. Ms. Durden indicated that Plaintiff had no problems with personal care, but she did not know whether he needed reminders to take his medication. AR at 189–90. Ms. Durden reported that Plaintiff could prepare "easy meals," and did so daily; however, he is unable to cook full meals like he did prior to becoming ill. *Id*. at 190.

Ms. Durden stated that Plaintiff could drive a car and went out daily without assistance. *Id*. at 191. Ms. Durden further stated that Plaintiff was able to shop in stores for groceries, but did not know how long it took him to do so. *Id*. Ms. Durden also stated that Plaintiff was able to pay bills, count change, and use a checkbook, but did not know whether he could handle a savings account. *Id*. Ms. Durden reported that Plaintiff's ability to handle money has changed since his illness, because he is easily confused. AR at 192.

Ms. Durden further reported Plaintiff's hobbies as watching television and reading, and indicated that he does these daily. *Id*. Ms. Durden described Plaintiff's social activities as daily visits with her, his mother. *Id*. Ms. Durden indicated that Plaintiff sometimes has problems getting along with family and friends, and described him as more outgoing prior to his illnesses. *Id*. at 193.

Ms. Durden reported that Plaintiff's illnesses affect his ability to lift; squat; bend; stand; reach; walk; sit; kneel; climb stairs; remember; complete tasks; concentrate; understand; follow instructions; use his hands; and get along with others. *Id*. Ms. Durden further reported that the "constant pain & swelling prevents normal ability in all these areas." *Id*. Ms. Durden did not know how far Plaintiff could walk prior to needing

a rest, but indicated that he could only pay attention for approximately five (5) to ten (10) minutes. *Id.* Ms. Durden also reported that Plaintiff does not finish what he starts, and does not follow written or spoken instructions. *Id.* Ms. Durden described Plaintiff as short tempered and irritable, and noted that he does not get along well with authority figures, or handle stress or changes in routine well. *Id.* at 194. Ms. Durden reported that Plaintiff wears glasses or contact lenses every day. *Id.* Ms. Durden further reported that Plaintiff had drastically declined over the prior eighteen (18) months, and noted her concern regarding his mental health conditions and medications. *Id.* at 195.

### 4. Plaintiff's Medical Records

On August 20, 2011, Plaintiff was seen at Saint Luke's Emergency Department "for evaluation after having an abdominal ultrasound at his primary care physician's office showing blockage of his abdominal aorta." AR at 271. Plaintiff's primary care physician referred him to the emergency department. *Id.* Plaintiff reported leg pain over the past two (2) years, increasing in the last two (2) months. *Id.* Plaintiff also reported color changes in his feet and an inability to walk one (1) block before he needs to sit down. *Id.* While in the emergency department, Plaintiff "had a CT angiogram runoff done, which showed blockage at the abdominal aorta just below the renal veins extending down to approximately the level of the femoral heads bilaterally." *Id.* Plaintiff's family history was positive for coronary artery disease and colon cancer. AR at 271. J. Aaron Grantham, M.D. examined Plaintiff and a review his systems was "negative except for claudication, edema, and leg weakness, numbness, and tingling." *Id.* Dr. Grantham's impression noted "bilateral lower extremity claudication[,] . . . Leriche syndrome, distal

aortic occlusion with reconstitution." *Id.* at 272. Dr. Grantham's plan included a consult with cardiothoracic surgery regarding bypass surgery. *Id.*

On November 15, 2011, Plaintiff was seen by Michelle R. Vieira, M.D. after slamming his middle finger in the car door and also sought a prescription to help him stop smoking. *Id.* at 327–28. On December 19, 2011, Plaintiff was seen by Louis D. Christifano, D.O. at Leawood Family Care, P.A. for a new patient intake and medication refill. AR at 324. Plaintiff also complained of bilateral lower leg numbness and discomfort. *Id.* Dr. Christifano diagnosed hyperlipidemia; tobacco abuse; artherosclerotic findings on x-ray; and lower leg numbness. *Id.* Plaintiff was referred to see Dr. Hellman regarding his lower leg numbness. *Id.* On the same date, Plaintiff underwent a lumbar spine x-ray, which was unremarkable. *Id*. at 326.

On January 6, 2012, Plaintiff was again seen in the Saint Luke's Hospital Emergency Department. AR at 289–300. Plaintiff's primary complaint was a swollen leg. *Id.* at 291. Plaintiff underwent bilateral lower extremity arterial Doppler, which demonstrated extensive atherosclerotic plaque. *Id.* at 285. John S. Yungmeyer, M.D. reported "advanced peripheral vascular disease with complete occlusion of the infrarenal abdominal aorta and right common iliac artery." *Id.* Accordingly, Plaintiff underwent a CT angiogram of his abdominal aorta and lower extremities. *Id.* at 283–84, 299–300. The angiogram found "total occlusion of the distal aorta at the level of the L3-L4 disc space which continues inferiorly through the bilateral common iliac and external iliac arteries." AR at 283, 299. Plaintiff was admitted to the hospital. *Id.* at 293. On January 9, 2012, Plaintiff underwent an aortobifemoral bypass graft. *Id.* at 281–82, 316–24.

Plaintiff was discharged on January 13, 2012, with palpable pulses in both lower extremities. *Id.* at 273–74. On January 18, 2012, Plaintiff followed up with Dr. Christifano after his surgery. *Id.* at 315. Dr. Christifano reported that Plaintiff was still tired and fatigued, but feeling better, and noted that he had good peripheral circulation. AR at 315.

On April 9, 2012, Plaintiff had a follow-up with William Daniel, M.D. at Saint Luke's Cardiovascular Consultants. *Id.* at 307–10. Dr. Daniel reported that Plaintiff "had a complete resolution of his claudication symptoms and rest pain." *Id.* at 307. Dr. Daniel further noted Plaintiff's multiple cardiac risk factors and that his lipids remained elevated. *Id.* Dr. Daniel also noted that Plaintiff was fatigued, experiencing daytime drowsiness, swelling in his ankles and legs, dysphasia, black or bloody stools, a skin rash, excessive thirst, cold intolerance, and feeling depressed. *Id.* at 308. Dr. Daniel noted that Plaintiff was struggling with his father's recent suicide. AR at 307, 309. On April 11, 2012, Plaintiff saw Dr. Christifano complaining of "depression, flared anxiety, emotional lability." *Id.* at 306. Plaintiff had returned to work after his father's suicide, but was having a hard time performing his duties as a bank teller, not sleeping well, and having difficulty focusing. *Id.* Plaintiff's cardiopulmonary exam was unremarkable. *Id.* Dr. Christifano prescribed Zoloft in addition to Plaintiff's current Wellbutrin prescription, and Plaintiff reported he would see a psychiatrist while visiting his family. *Id.* On April 20, 2012, Plaintiff's request for unpaid leave under the Family Medical Leave Act was granted based upon Dr. Christifano's report. AR at 528–32. Dr. Christifano described Plaintiff as "tearful, distraught[,] and emotionally labile secondary to the unexpected

death due to suicide of his father." *Id.* at 530. On May 21, 2012, Plaintiff again saw Dr. Christifano for a left eye subconjunctival hemorrhage. *Id.* at 304–05.

On September 21, 2012, Plaintiff saw Amy Rosenberg, M.D. to discuss his cardiac condition and for a medication refill. *Id.* at 359–61. Plaintiff reported he had recently moved to Arizona from Missouri, and due to multiple personal issues have not followed up with his surgeon are cardiologist for additional evaluation. *Id.* at 359. As such, he had not been taking any medications except for aspirin and was concerned his blood pressure might be high and also wanted evaluation for his lower extremity neuropathy. AR at 359. Plaintiff also reported a history of bipolar disorder and wanted an antidepressant. *Id.* Dr. Rosenberg reported trace pitting edema bilaterally in Plaintiff's ankles, cold lower extremities, pulses palpable but less than +1 in dorsalis pedis and posterior tibialis, and popliteal pulses appreciated bilaterally. *Id.* Dr. Rosenberg further reported that Plaintiff's affect was appropriate and mood pleasant; however, he cried multiple times during the interview and exam. *Id.* Dr. Rosenberg assessed benign essential hypertension; bipolar disorder, unspecified; and peripheral vascular disease. *Id.* at 360. Dr. Rosenberg referred Plaintiff to behavioral health and a cardiologist. AR at 360.

On October 5, 2012, Plaintiff was seen by Maria Bustamante, FNP-C at the Amado Clinic to establish care as directed by Dr. Rosenberg. *Id.* at 354–58. Plaintiff's mother accompanied him to the visit, and was in part the history supplier. *Id.* at 354. Plaintiff was concerned about swelling and a pins and needles sensation in his lower extremities and feet, as well as being very anxious, irritable, easily upset, and having

trouble sleeping.  *Id.*  Plaintiff reported that he had not been able to establish behavioral health care, because he lacks insurance.  *Id.*  NP Bustamante's examination indicated bilateral lower extremity swelling up to the knee level with numbness.  AR at 354.  NP Bustamante assessed benign essential hypertension; dyslipidemia; irritability; anxiety; peripheral artery disease ("PAD"); and polyneuropathy.  *Id.* at 355.  NP Bustamante's treatment included prescriptions for hydrochlorothiazide, Norvase, buspirone, and gabapentin.  *Id.* at 356–57.  NP Bustamante also directed Plaintiff to proceed with treatment for psychiatric evaluation and management.  *Id.* at 357.  On October 17, 2012, Plaintiff followed up with NP Bustamante to review his blood work and clarify his blood pressure medication dosage.  *Id.* at 349–53.  Plaintiff reported doing better.  AR at 349. NP Bustamante's physical examination was unremarkable, showing improved edema and lower extremity pulses.  *Id.*  Plaintiff indicated that his anxiety, while still present, was improved with BuSpar, and his leg numbness was much improved with gabapentin.  *Id.*

On November 16, 2012, Plaintiff followed up with NP Bustamante to review his laboratory results.  *Id.* at 345–48.  NP Bustamante's physical examination was unremarkable, and her treatment plan directed Plaintiff to continue with his statin and low-fat diet for dyslipidemia.  *Id.* at 345.  On December 19, 2012, Plaintiff saw NP Bustamante regarding swelling in his lower extremities, which was becoming more painful after he began working part-time.  AR at 342–44.  Plaintiff reported that the swelling is in his thighs, as well as his lower extremities, after he's been up all day.  *Id.* at 342.  Plaintiff also complained of joint pain and was wondering if it could be related to the statin.  *Id.* NP Bustamante's physical examination was generally unremarkable,

- 15 -

except for non-pitting trace edema up to the knee level in Plaintiff's lower extremities. *Id.* NP Bustamante prescribed additional medication to treat Plaintiff's swelling; referred Plaintiff to cardiology to address his increasing fatigue; increased his dosage of gabapentin; and directed Plaintiff to hold the statin for two (2) weeks to see if that resulted in reduced joint pain. *Id.* at 343.

On May 23, 2013, Plaintiff saw NP Bustamante to request a referral to do a cardiologist and review his medications. AR at 338–41. NP Bustamante's physical examination was unremarkable. *Id.* at 338. NP Bustamante noted that Plaintiff's chest pain, shortness of breath, and palpitations had resolved since he had lost thirty (30) pounds, but Plaintiff continued to smoke both nicotine and marijuana. *Id.* NP Bustamante treated Plaintiff for benign essential hypertension and referred him to cardiology. *Id.* at 339–40.

On June 26, 2013, Plaintiff saw NP Bustamante for back pain which had not resolved with medication after four (4) months. *Id.* at 334–35. Plaintiff complained of moderate to severe pain radiating into his right posterior leg at knee level, with no weakness to his lower extremities. AR at 334. Plaintiff reported being able to walk for more than six blocks without having to stop and rest. *Id.* NP Bustamante noted Plaintiff's straight leg raise test was positive on the right at approximately thirty (30) degrees, as was his cross leg raise. *Id.* NP Bustamante also noted that Plaintiff appeared anxious. *Id.* NP Bustamante assessed lumbago, muscle spasm, weight loss, and peripheral artery disease. *Id.* at 334–35.

A September 5, 2013 x-ray of Plaintiff's lumbar spine was unremarkable, with all

structures within normal limits. AR at 333. On September 11, 2013, Plaintiff saw NP Bustamante to discuss his medications. *Id*. at 330–32. Plaintiff reported feeling good and requested smoking cessation assistance. *Id.* at 330. NP Bustamante's physical examination was unremarkable, and noted that Plaintiff's mood and affect were both normal. *Id.* NP Bustamante wrote prescriptions for nicotine abuse and hypertension. *Id.* at 330–31.

On December 31, 2013, Jerome Rothbaum, M.D. examined Plaintiff at the request of the Arizona Department of Economic Security ("AZDES"). AR at 364–77. Dr. Rothbaum reported that he perused Plaintiff's medical records as part of his examination. *Id*. at 364. Dr. Rothbaum noted Plaintiff's chief complaints as aortobifemoral bypass graft, as well as symptoms of neuropathy. *Id.* Dr. Rothbaum further noted Plaintiff's complaints of low back pain and numbness and tingling in his lower back extremities. *Id.* at 364–65. Dr. Rothbaum also noted that Plaintiff reported "rather significant exertional dyspnea." *Id*. at 365. Dr. Rothbaum's physical examination was generally unremarkable, and he did not note any clubbing, edema or cyanosis. AR at 365–67. Dr. Rothbaum reported that Plaintiff dressed and undressed normally, heel and toe walked normally, squatted normally, walked normally, and got up and down from the examining table normally. *Id.* Dr. Rothbaum also performed a pulmonary function study on Plaintiff and noted "a severe reduction in the FEV1 as well as the ratio of FEV1/FVC." *Id.* at 370–77. Dr. Rothbaum found these results to be "compatible with a moderately severe obstructive defect without significant improvement in the FVC or the FEV1." *Id.* at 370. Dr. Rothbaum's impression and diagnosis included peripheral artery disease

status post aortobifemoral bypass; nicotine abuse; chronic obstructive pulmonary disease ("COPD"); history of questionable neuropathy; history of myofascial low back pain; and bipolar. *Id.* at 367. Dr. Rothbaum also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) regarding Plaintiff. AR at 367–69. Dr. Rothbaum noted that Plaintiff's conditions were expected to continue for twelve (12) months. *Id.* at 367. Based primarily on Plaintiff's COPD, Dr. Rothbaum limited Plaintiff's lifting and/or carrying to twenty (20) pounds occasionally, and ten (10) pounds frequently. *Id.* at 367–68. Dr. Rothbaum opined that Plaintiff did not have any limitations in standing or walking or require an assistive device. *Id.* at 368. Dr. Rothbaum further opined that Plaintiff was also not limited in sitting, seeing, hearing, or speaking. *Id.* Dr. Rothbaum also opined that Plaintiff had no limitations on his ability to stoop; kneel; crouched; crawl; reach; handle; finger; or feel. AR at 369. Dr. Rothbaum opined, however, that Plaintiff should only occasionally climb ramps or stairs, and never climb ladders, ropes, or scaffolds. *Id.* Dr. Rothbaum further opined that Plaintiff was unrestricted in working around moving machinery; extremes in temperature; and excessive noise. *Id.* Dr. Rothbaum did indicate restrictions for Plaintiff working around heights; with her around chemical; or around dust/fumes or gases. *Id.*

On February 13, 2014, Plaintiff saw James Derickson, M.D. for chest pain and anxiety. *Id.* at 596–98. Dr. Derickson noted that Plaintiff reported experiencing "subxiphoid pain and pain and numbness in antecubital fossae under the following conditions[:] getting upset, carrying 2 gallons of milk from the car to the back of the store[,] taking ice 2 trips to back of store, walking 1.5 x the 1/16 mile from car to his

house and carrying kitty litter[.]" AR at 596. Plaintiff further reported "that he is crazy . . . [and feels] angry, [with] strange thoughts that he can't describe, other than to say that the thoughts don't make sense and so he walks away from whomever he is talking to[.]" *Id*. Dr. Derickson reported that Plaintiff has no energy and does not walk or do any exercise, does not enjoy anything, watches some television, and works in a store but that bothers him most of the time. *Id.* Dr. Derickson further noted lower extremity edema, with swelling either in a thighs or ankles, but mostly in Plaintiff's calves. *Id.* Plaintiff also reported getting cramps in his legs. *Id.* Dr. Derickson's physical examination was unremarkable, but noted that Plaintiff was agitated with the person at the front desk. AR at 598. Dr. Derickson's assessment included bipolar disorder I, with Plaintiff's most recent episode depressed; chest pain; history of bypass graft (non-vein) femoral-popliteal; health maintenance; and paternal history of father deceased. *Id*. On February 20, 2014, Plaintiff returned to Dr. Derickson to review blood pressure and medication changes. *Id.* at 593–95. Plaintiff reported that the Cymbalta is okay and feels that his legs are better. *Id.* at 593. Plaintiff also reported stopping Lasix and now just elevates his feet at the end of the day, and the reduction in Wellbutrin has not increased his smoking. *Id.* Plaintiff further reported that he is still short tempered, so he stays away from others. AR at 593. Dr. Derickson's physical examination of Plaintiff was otherwise unremarkable. *Id.* at 594. Dr. Derickson's plan adjusted some of Plaintiff's prescriptions and coordinated care. *Id.* at 594–95.

On March 3, 2014, Plaintiff was seen by Moeen Din, M.D. for a lower extremity electromyogram/nerve conduction velocity ("EMG/NCV") study. *Id.* at 378–80.

Plaintiff complained of lower extremity numbness, which was worse in the right leg.  *Id.* at 378.  Dr. Din found reduced amplitude in Plaintiff's right and left peroneal motor and right and left sural sensory NCV.  AR at 378.  Dr. Din further found Plaintiff's motor unit potentials and recruitment abnormal on EMG.  *Id.*  Dr. Din reported "[t]his is an abnormal study suggestive of diffuse axonal polyneuropathy."  *Id.*  On March 13, 2014, Plaintiff saw Dr. Derickson for chest pain and medication refills.  AR at 590–92. Plaintiff reported that he had a behavioral health interview; saw Dr. Ata, but was "unable to complete the stress test due to pain in his legs so a nuclear test [wa]s scheduled for March 20"; he had no feeling in his right leg during the EMG, so he will return to complete that test; his mother fired him two (2) days prior; and he developed chest pain radiating into his arms while carrying laundry, which resolved after less than approximately five (5) minutes after he stopped and put the laundry down.  *Id.* at 590. Dr. Derickson's physical examination was otherwise unremarkable, and he prescribed a nitroglycerin patch to help prevent angina.  AR at 591.  On March 31, 2014, Plaintiff followed up with Dr. Din.  *Id.* at 382–84.  Dr. Din confirmed Plaintiff's EMG/NCV results showed axonal neuropathy.  *Id.* at 382.  Dr. Din's physical and neurological examinations were generally unremarkable.  *Id.* at 383.  Dr. Din's impression included sensory-motor axonal poly-neuropathy; degenerative joint disease in the lumbar spine; lumbar radiculopathy at L4-5, L5-S1; and history of bipolar disorder.  *Id.* at 384.  Dr. Din's plan included reordering magnetic resonance imaging ("MRI") of Plaintiff's lumbar spine.  AR at 384.  On March 11, 2014, Plaintiff saw cardiologist Imran Ata, M.D. to establish care.  *Id.* at 510–14.  Dr. Ata noted Plaintiff complained of some chest

discomfort with exertion, which dissipates with rest, as well as some pain in both of his arms. *Id.* at 510. Dr. Ata's physical examination was unremarkable. *Id.* at 510–11. Dr. Ata's impression included hypertension; peripheral vascular disease, unspecified; chest pain, which appears atypical; hypertension; hyperlipidemia; and smoking. *Id.* at 511. Dr. Ata prescribed an exercise nuclear stress test, and noted if Plaintiff was unable to walk on the treadmill because of his back pain or peripheral neuropathy, that it could be converted to a chemical stress test. AR at 511.

On April 3, 2014, Plaintiff underwent a Myocardial Perfusion Imaging ("MPI") study. *Id.* at 507–09. Plaintiff walked for eight (8) minutes and fifty (50) seconds and completed the protocol. *Id.* at 507, 509. Plaintiff suffered shortness of breath and chest pain. *Id.* Dr. Ata reported "[a] moderate to large perfusion abnormality of severe intensity noted in the inferior, inferoapical and inferior septal region on the stress images." *Id.* Dr. Ata's impression reported a moderate to large inferior wall ischemia. AR at 508. On April 8, 2014, Plaintiff followed up with Dr. Ata. *Id.* at 504–06. Dr. Ata's physical examination of Plaintiff was unremarkable. *Id.* at 505. Dr. Ata directed Plaintiff that he needed to stop smoking and scheduled him for a cardiac catheterization. *Id.* On April 4, 2014, Plaintiff was seen by Dr. Derickson for a routine follow-up. *Id.* at 588–89. Dr. Derickson noted that Plaintiff had been unable to get Seroquel due to the need for prior authorization from AHCCCS, but was able to pay out-of-pocket for a lower dosage of Cymbalta. AR at 588. Plaintiff updated Dr. Derickson regarding Dr. Din's peripheral neuropathy diagnosis. *Id.* Plaintiff also reported being tired. *Id.* Dr. Derickson's physical examination was unremarkable, and he reported an assessment of

bipolar I disorder, with the most recent episode depressed; angina pectoris; current smoker; and hypertension. *Id.* at 589.

On April 15, 2014, Imran Ata, M.D. performed a coronary angiogram on Plaintiff. *Id.* at 401–05. Dr. Ata found 100% occlusion of Plaintiff's left anterior descending ("LAD") coronary artery in its proximal course. AR at 402. Dr. Ata referred Plaintiff to a surgeon for possible coronary artery bypass graft. *Id.* On April 17, 2014 Plaintiff saw David A. Arzouman, M.D. regarding his coronary artery disease. *Id.* at 396–400. Dr. Arzouman reported Plaintiff to have "severe 3-vessel coronary artery disease." *Id.* at 398. As such, Dr. Arzouman recommended triple bypass surgery. *Id.* On April 18, 2014 Plaintiff underwent a chest x-ray, ultrasound, and lab work preoperative to cardiothoracic surgery. AR at 385–95. No acute cardiopulmonary abnormality or significant carotid stenosis was found. *Id.* at 392, 394. On April 22, 2014, Plaintiff was seen in the St. Mary's Hospital Emergency Department. *Id.* at 406–12. Plaintiff reported "acute onset of epigastric discomfort and intractable vomiting." *Id*. at 408. Plaintiff's EKG indicated normal sinus rhythm and no change when compared to a prior EKG, and his blood work was unremarkable. *Id.* at 409. Plaintiff reported taking a dose of quetiapine prior to his emergency department visit, which was attributed to his drowsiness and near syncopal episode. AR at 409, 411. After receiving IV fluids, Plaintiff returned to his baseline. *Id.* at 409, 412. On April 23, 2014, Plaintiff was admitted to St. Mary's Hospital for triple bypass surgery performed by Dr. Arzouman. *Id.* at 422–60. Plaintiff's surgery was successful, although he had some issues with pain and anxiety postoperatively. *Id.* at 422, 424, 430–33. On April 27, 2014, Plaintiff called Dr. Derickson complaining that the

nurses were not giving him his medication on time. *Id.* at 602. Plaintiff's mother then called to inform Dr. Derickson that Plaintiff was trying to leave the hospital against medical advice. AR at 602. Dr. Derickson called Dr. Arzouman to request that Plaintiff have a full psych evaluation before he was discharged because his bipolar disorder is not controlled. *Id.* Dr. Derickson reported that Plaintiff had called or texted his mother twenty (20) times in the previous hour, as well as calling Dr. Derickson to fire him for telling his mother that he was incompetent to make decision and leave the hospital without a psych evaluation. *Id.* Dr. Derickson advised Plaintiff's mother to go to Plaintiff's house and retrieve his gun and knife, because Plaintiff's manic phase was lasting longer likely due to the stress of the surgery and being in hospital. *Id.* Dr. Derickson further noted that Plaintiff required an evaluation when he is upset. *Id.* Plaintiff was discharged on April 28, 2014. AR at 422.

On May 2, 2014, Dr. Derickson spoke with Plaintiff's brother Jamie, who was in Arizona for two weeks to help Plaintiff. *Id.* at 600–01. Jamie expressed frustration with Plaintiff's attitude. *Id.* at 600. Dr. Derickson advised Jamie to not take Plaintiff's comments seriously in light of his mental health issues, but encouraged him to call 911 if Plaintiff became violent or was otherwise out-of-control. *Id.* On May 7, 2014, Plaintiff followed up with NP Bustamante. *Id.* at 490–91. Plaintiff reported feeling down, depressed, or hopeless, with little interest or pleasure in doing things. AR at 490. Plaintiff was two weeks post bypass surgery, and reported doing well without further chest pain, shortness of breath, or palpitations. *Id.* NP Bustamante also noted no edema. *Id.* NP Bustamante's physical exam was otherwise unremarkable. *Id.* On May 9, 2014,

Dr. Derickson noted Plaintiff's change of primary care physicians to NP Bustamante, thereby concluding his care. *Id.* at 599. On May 21, 2014, Plaintiff completed a behavioral health and medical questionnaire and core assessment. AR at 462–76. Plaintiff listed his medications, noting side effects including drowsiness, and dizziness when driving, and difficulty with comprehension. *Id.* at 462. Plaintiff reported suffering pain every day, with his current pain between six (6) and eight (8) out of ten (10). *Id.* at 463. Plaintiff further reported daily chest pain and daily swelling in his legs, as well as daily joint and back pain. *Id.* Plaintiff also noted his triple bypass surgery and "chronic back and knee pain due to peripheral neuropathy, peripheral vascular disease, hypertension, [and] high cholesterol[.]" *Id.* at 464. Plaintiff indicated that he had quit smoking. AR at 464. Plaintiff reported that he was seeking help managing his bipolar symptoms, and that he has been suffering depression and mood swings his entire life. *Id.* at 466. Plaintiff further reported that his symptoms increased following his father's suicide. *Id.* Plaintiff also reported symptoms of depressed mood, low self-esteem, isolation, mood swings, and irritability. *Id.* Plaintiff reported an inability to do things by himself at times, not wanting to go out, and having friends and family help him with household chores. *Id.* Plaintiff stated that he was taking a mood stabilizer and other psychiatric medications to treat his anxiety and depression prescribed by his primary care physician. AR at 466. Plaintiff reported a prior history of substance abuse and daily use of marijuana for pain. *Id.* at 466–68. Plaintiff did not indicate any risk factors for harming himself or others, except for past suicidal ideation and a family history of suicide. *Id.* at 470–71. Plaintiff's mental status was unremarkable, except for low self-

esteem. *Id.* at 471–72. Plaintiff's Axis I diagnosis included bipolar disorder, not otherwise specified and cannabis abuse. *Id.* at 473. Plaintiff did not have an Axis II diagnosis, and Axis III noted high cholesterol, peripheral neuropathy, hypertension, and peripheral vascular disease. AR at 473. Plaintiff's Axis IV diagnosis included occupational problems, financial issues, and recent surgery. *Id.* at 474. Plaintiff's Global Assessment of Functioning ("GAF") score was sixty (60). *Id.* Plaintiff described his average day as having breakfast at the shop, going to doctor appointments, watching television, and taking care of his dog. *Id.* at 477. Plaintiff further reported getting along well with everyone. *Id.* at 478. Plaintiff also reported his pain as a barrier to his ability to work. AR at 480.

On May 14, 2014, Plaintiff saw cardiologist Monty C. Morales, M.D. for a follow-up from his bypass surgery. *Id.* at 501–03. Dr. Morales reported that Plaintiff was recovering well, his incision looked good with very minor incisional discomfort. *Id.* at 501. Plaintiff reported occasional "panting" episodes which Dr. Morales noted might be transient afib. *Id.* Dr. Morales noted that Plaintiff had no chest discomfort suggestive of ischemia, and that Plaintiff denied orthopnea, paroxysmal nocturnal dyspnea, dyspnea on exertion, or edema. *Id.* Plaintiff did report having palpitations, but denied claudication or any stroke like symptoms. AR at 501. Dr. Morales further noted that there was no discoloration or ulceration of Plaintiff's lower extremities. *Id.* Dr. Morales's physical examination was unremarkable, and he reported Plaintiff's condition to be stable. *Id.* at 502.

On June 10, 2014, Plaintiff was seen by Betty Yurgel, PMHNP-BC at Pinal

Hispanic Council for a psychiatric evaluation. *Id.* at 482–86. Plaintiff described getting angry and exploding easily, especially with his mother. *Id.* at 482. Plaintiff reported that AHCCCS would no longer pay for Seroquel or Cymbalta. AR at 482. Plaintiff further reported his extensive family history of mental illness, including his father suicide. *Id.* at 482–83. NP Yurgel reported Plaintiff's thought content as nonpsychotic, but depressive and with occasional suicidal ideation without a plan. *Id.* at 484. NP Yurgel further reported that Plaintiff's perception was normal; he was oriented ×4; concentration was good; memory was intact; fund of knowledge was good; insight was fair; and judgment was fair. *Id.* NP Yurgel diagnosed bipolar disorder, not otherwise specified, and cannabis abuse, and a GAF score of 55. *Id.* Plaintiff's examination was otherwise unremarkable. AR at 385. NP Yurgel prescribed Cymbalta and Seroquel, as Plaintiff had reported them to be very effective previously. *Id.* at 486.

On July 3, 2014, Plaintiff followed up with NP Bustamante for high blood pressure. *Id.* at 488–89. NP Bustamante also noted that Plaintiff was suffering from moderate depression. *Id.* at 488. Plaintiff reported regularly checking his blood pressure at home, and that morning his systolic was in the 190s. *Id.* Plaintiff indicated having occasional headaches, but no other unusual cardiac symptoms. AR at 488. NP Bustamante's physical examination was otherwise unremarkable. *Id.* at 488–89. On July 9, 2014, Plaintiff saw Dr. Morales for a follow-up. *Id.* at 498–500. Dr. Morales noted that Plaintiff felt okay, but his blood pressure was elevated and his legs were mottled at the knee with decreased pulses. *Id.* at 498. Dr. Morales's physical examination was otherwise unremarkable. *Id.* Dr. Morales reported Plaintiff's condition post bypass

surgery and hypertension as stable. AR at 499. Dr. Morales further reported Plaintiff's peripheral vascular disease status is unknown and coronary artery disease as stable, and ordered lower extremity arterial duplex, renal duplex, abdominal aortic duplex, and carotid duplex Doppler scans. *Id.* at 498–99. On July 30, 2014, Plaintiff again followed up with Dr. Morales regarding his coronary artery disease and hypertension following his bilateral lower extremity arterial duplex scan after reporting pain in his legs. *Id.* at 493–97. Dr. Morales's physical examination of Plaintiff was unremarkable. *Id.* at 494–95. Dr. Morales reported that Plaintiff's recent Doppler did not show any obstructive disease in his legs, carotids, or renals. *Id.* at 495. Dr. Morales further reported that Plaintiff's post-operative coronary bypass status and arteriosclerotic heart disease were stable, and his hypertension reasonably well controlled. AR at 495.

On December 2, 2014, Plaintiff followed up with NP Bustamante. *Id.* at 514–20. NP Bustamante ordered blood work and a lateral posteroanterior chest x-ray. *Id.* at 514. NP Bustamante also refilled Plaintiff's prescriptions for cyclobenzaprine and gemfibrozil. *Id.* On December 15, 2014, Plaintiff had lateral posteroanterior chest x-rays taken. *Id.* at 574–75. Barbra Ross M.D. noted "[l]eft pleural effusion versus pleural thickening, unchanged compared to prior study[,] [with] [n]o new abnormalities [] seen." AR at 574. Michael P. Murphy, M.D. reviewed Plaintiff's front lateral view of the chest. *Id.* at 575. Dr. Murphy noted a small loft pleural effusion with a "blunting of left costophrenic angle." *Id.* On December 16, 2014, Plaintiff saw NP Yurgel for behavioral health treatment. *Id.* at 537–39. Plaintiff reported some depression due to physical health issues. *Id.* at 537. NP Yurgel noted Plaintiff's GAF score as 60, with other assessment

areas unremarkable.  AR at 537–38.  NP Yurgel reported Plaintiff's status worsened due to increased depression with increased stressors, but noted he did not have any suicidal or homicidal ideations.  *Id.* at 538.  On December 18, 2014, Plaintiff saw NP Bustamante to review his x-ray results.  *Id.* at 568–69.  Plaintiff's depression screening was negative, and NP Bustamante's physical examination unremarkable.  *Id.* at 568.  NP Bustamante informed Plaintiff of the pleural effusion, but noted that he was asymptomatic at this time and would be monitored.  *Id.*  On December 30, 2014, Plaintiff saw Ashlyn J.  Dumais, NP for a follow-up for aortobifemoral graft surveillance.  AR at 578–80.  NP Dumais noted that Plaintiff was a former smoker, he was using marijuana nightly, and moderately exercising three times per week.  *Id.* at 579.  NP Dumais's physical examination was otherwise unremarkable.  *Id.* at 579–80.  On the same date, Plaintiff underwent an abdominal aortic-iliac duplex Doppler.  *Id.* at 576–77.  Plaintiff reported bilateral buttock claudication after walking approximately 1/8 of a mile.  *Id.* at 576.  Plaintiff further reported rest to recovery time was two (2) to three (3) minutes.  AR at 576.  Plaintiff also complained of his legs feeling cold all the time.  *Id.*

On January 14, 2015, Plaintiff saw NP Bustamante to review his lab results.  *Id.* at 564–67.  Plaintiff reported that his bipolar disorder was currently stable and he was not feeling depressed; however, still suffers anxiety when in large groups or busy places.  *Id.* at 564–65.  NP Bustamante's physical examination of Plaintiff was otherwise unremarkable.  *Id.* at 564.  On January 20, 2015, Plaintiff saw NP Yurgel for a medication check.  *Id.* at 540–43.  NP Yurgel noted that Plaintiff continued to complain of increased anxiety while in crowds; however he also reported that the Seroquel was

helping, his mood was stable, and his depression improved. AR at 541. NP Yurgel's further examination of Plaintiff was unremarkable, and she noted his status was improved. *Id.* at 541–42. On the same date, NP Yurgel also wrote a letter regarding her treatment of Plaintiff. *Id.* at 521. NP Yurgel noted that Plaintiff had been her client at Pinal Hispanic Council since June 10, 2014. *Id.* NP Yurgel further reported Plaintiff's diagnosis of bipolar disorder not otherwise specified. *Id.* NP Yurgel indicated that Plaintiff experiences increased anxiety and panic in crowds which affect his daily functioning, and has a history of mood disturbances including depression, mania, and suicidal thoughts. AR at 521. NP Yurgel noted Plaintiff's prescriptions for Seroquel and Cymbalta. *Id.*

On January 22, 2015, James L. Derickson, M.D. saw Plaintiff to review his disability paperwork. *Id.* at 585–87. Dr. Derickson noted that he concurred that Plaintiff "is very limited in his ability to work[,] [as] [h]e has diffuse vascular disease and has limits. *Id.* at 586. Dr. Derickson further noted that he agreed with Plaintiff that the latter's shortness of breath is from his cardiac issues and panic. *Id.* Dr. Derickson recommended that Plaintiff ride a reclining bicycle for ten minutes, three times per day, and further noted that Plaintiff "cannot walk long enough or enough times to really help the circulation." AR at 586. On the same date, Dr. Derickson completed a report regarding a trial return to work. *Id.* at 522–24. Dr. Derickson indicated that Plaintiff should never climb ladders, scaffolds, or ropes; and should operate moving machinery less than two (2) hours per day. *Id.* at 522. Dr. Derickson limited Plaintiff's physical exertion and activities to standing or walking less than two hours per day, as well as

sitting less than two hours per day. *Id.* Dr. Derickson opined that Plaintiff should never perform any handling, although he was unsure what that entailed. *Id.* Dr. Derickson further limited plaintiff's fingering, lifting and carrying less than 10 pounds, as well as less than 20 pounds to less than two hours per day. AR at 523. Dr. Derickson found that Plaintiff should never carry more than 20 pounds. *Id.* Dr. Derickson opined that Plaintiff would be expected to require more rests or breaks than is typically required, and would need to lie down and in unpredictable times in an eight (8) hour day. *Id.* Of note, Dr. Derickson crossed out the word "work" as a descriptor of an eight (8) hour day. *Id.* On January 29, 2015, Dr. Morales completed a release for a trial return to work. *Id.* at 525–27. Dr. Morales opined that Plaintiff should never climb ladders, scaffolds, or ropes; but could operate moving machinery more than two (2) hours but less than six (6) hours per day. AR at 525. Dr. Morales opined that Plaintiff's total time standing or walking should be limited to less than two hours per day due to shortness of breath and leg pain, and should sit less than two (2) hours per day due to vascular diagnosis. *Id.* at 525. Dr. Morales further opined that Plaintiff could perform fingering more than two (2) hours but less than six (6) hours per day, and limited his lifting and carrying to less than two (2) hours per day for both less than ten (10) pounds, as well as between ten (10) and twenty (20) pounds. *Id.* at 526. Dr. Morales reported that Plaintiff should never carry more than twenty (20) pounds. *Id.* Dr. Morales further reported that Plaintiff would not need to do to be able to shift at will from sitting to standing, but would be expected to require more rests or breaks than is typically required and would need to lie down at unpredictable times in an eight (8) hour workday. *Id.* Dr. Morales recommended cardio rehabilitation

three (3) times per week.  AR at 527.

On April 1, 2015, Plaintiff's annual behavioral health update and review summary indicated that Plaintiff reported "doing better with medication, but [] becomes very anxious and angry when he is in crowded places[.]" *Id.* at 544.  Plaintiff further reported he had been "trying to help his mother in the coffee shop[,] but [] is not able to handle it[.]" *Id.*  Plaintiff also reported that he uses marijuana to reduce his physical pain caused by peripheral neuropathy.  *Id.* at 544–45.  The update notes that Plaintiff has been compliant with his medication and treatment recommendations, both as to his behavioral health and his primary care physician recommendations.  *Id.* at 544.  The update further notes that Plaintiff continues to have problems managing his anxiety and anger.  AR at 545.  Plaintiff's GAF score remained 60.  *Id.* at 546.

On June 16, 2015, Plaintiff was seen by Yulianna Inzunza, FNP-C to transfer care and review medications.  *Id.* at 562–63.  Plaintiff reported daily peripheral neuropathy pain controlled with medication and smoking marijuana daily.  *Id.* at 562.  NP Inzunza's Depression screening of plaintiff was negative and physical examination unremarkable.  *Id.* at 562–63.  NP Inzunza assessed polyneuropathy and dyslipidemia, and gave Plaintiff advice on a low-fat, low-cholesterol diet and encouraged him to stay active or walk as tolerated.  AR at 563.  On July 14, 2015, Plaintiff saw NP Inzunza to discuss chills and sweats.  *Id.* at 559–61.  Plaintiff was suffering chills for approximately three (3) weeks without fever.  *Id.* at 559.  NP Inzunza's physical examination was otherwise unremarkable, and she ordered blood work to determine the reason behind Plaintiff's condition.  *Id.*

On August 14, 2015, Plaintiff saw NP Yurgel for medication monitoring. *Id.* at 547–51. Plaintiff reported he was doing well, although his dog had passed away he was coping and his mood was stable. AR at 549. NP Yurgel's examination was otherwise unremarkable. *Id.* at 549–50. NP Yurgel reported Plaintiff's GAF score to be 60, and noted that he continued to do well. *Id.*

On September 11, 2015, NP Yurgel completed a Mental Residual Functional Capacity Assessment on behalf of Plaintiff. *Id.* at 553–54. NP Yurgel noted that Plaintiff's degree of impairment in his ability to relate to other people, restriction of daily activities, degree of deterioration and personal habits, and degree of constriction of interests varied based on the severity of his symptoms. *Id.* at 553. NP Yurgel further noted that she had not tested Plaintiff, when he was exhibiting increased symptoms, regarding his ability to understand, carry out, and remember instructions; respond appropriately to supervision; or respond appropriately to coworkers; however, she estimated his abilities as moderate to severe. AR at 553. NP Yurgel opined that Plaintiff's ability to respond to customary work pressures would be severely limited with increased symptoms, noting stress can cause and increase in his symptoms. *Id.* NP Yurgel further opined that Plaintiff's ability to perform simple's tasks would vary depending on whether he was suffering from increased symptoms or was stable or unstable. *Id.* NP Yurgel reported that she had never assessed or tested Plaintiff's ability to perform complex, repetitive, or varied tasks. *Id.* at 554. NP Yurgel opined that Plaintiff would likely be unable to complete a normal workday or workweek without interruptions from psychologically-based symptoms. *Id.* NP Yurgel reported Plaintiff's

illness to have a long term prognosis, and his symptoms could vary from mild to severe depending on, but not limited to, environmental situations, stress, medication, and psychosocial factors.  AR at 554.

## II.     STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error.  42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).  This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."  *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'"  *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014).  Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).  Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ."  *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).  Moreover, the court may not focus on an isolated piece of

supporting evidence, rather it must consider the entirety of the record weighing both evidence that supports as well as that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

## III.   ANALYSIS

### A.   *The Five-Step Evaluation*

The Commissioner follows a five-step sequential evaluation process to assess whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  This process is defined as follows:  Step one asks is the claimant "doing substantial gainful activity[?]"  If yes, the claimant is not disabled; step two considers if the claimant has a "severe medically determinable physical or mental impairment[.]"  If not, the claimant is not disabled; step three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1.  If not, the claimant is not disabled; step four considers the claimant's residual functional capacity and past relevant work.  If claimant can still do past relevant work, then he or she is not disabled; step five assesses the claimant's residual functional capacity, age, education, and work experience.  If it is determined that the claimant can make an adjustment to other work, then he or she is not disabled.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2017, and was not engaged in substantial gainful activity since his alleged onset date of September 4, 2012.  AR at 22. At step two of the sequential evaluation, the ALJ found that "[t]he claimant has the

following severe impairments: chronic obstructive pulmonary disease (COPD); degenerative joint disease; polyneuropathy; peripheral artery disease (PAD); kidney disease; colon disease (20 CFR 404.1520(c))." *Id.* at 23. At step three, the ALJ found that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526)." *Id.* at 24. Prior to step four and "[a]fter careful consideration of the entire record," the ALJ determined that "the claimant has the residual functional capacity to perform a wide range of light work; sit 6 hours out of an 8-hour day; stand 6 hours out of an 8-hour day; walk 6 hours out of an 8-hour day; occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; occasionally climb stairs; never climb ladders; can have only occasional exposure to heights, chemicals, dust fumes and smoke; occasional is defined as very little to one-third of the time; never is defined as no useful ability." *Id.* at 25. At step four, the ALJ found that "[t]he claimant is capable of performing past relevant work as a beautician and registration clerk[,] [as] [t]his work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565)." *Id.* at 30. Accordingly, the ALJ determined that Plaintiff was not disabled. AR at 30.

Plaintiff asserts that the ALJ erred in failing to consider substantial evidence in the record regarding Plaintiff's allegations of polyneuropathy and swelling feet and hands; failing to give the opinions of treating physician James Derickson, M.D. proper weight; failing to give the appropriate weight to Nurse Practitioner Betty Yurgel's opinions; and

giving improper weight and consideration to reports of Plaintiff's activities of daily living.  Pl.'s Opening Br. (Doc. 20) at 10, 14–20.

**B.    *Treating Physician Opinion***

Plaintiff asserts that the ALJ "gave limited weight to the January 2015 residual functional capability statement of Dr. James Derickson, who treated Mr. Jones, noting a short treating history and lack of supporting documentation[,] . . . [but] [r]ecords obtained after the decision, submitted to and considered by Appeals Council and made part of the administrative record, show that Mr. Jones did treat with Dr. Derickson for at least an approximate year prior to the statement."  Pl.'s Opening Br. (Doc. 20) at 17.  Conversely, the Commissioner argues that "[a]lthough the submission of Dr. Derickson's records obviously obviates the ALJ's concern about the lack of any treatment records from Dr. Derickson, the ALJ's finding that Dr. Derickson's opinion was inconsistent with Plaintiff's treatment records is still supported by substantial evidence and sufficient to support the ALJ's rejection of Dr. Derickson's contradicted checkbox opinion."  Def.'s Response (Doc. 21) at 8.

**1. Legal Standard**

"As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996) (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)); *see also Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014).  "The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'"  *Morgan v. Comm'r of the*

*SSA*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987) (citations omitted)).  "The ALJ may not reject the opinion of a treating physician, even if it is contradicted by the opinions of other doctors, without providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (citing *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)); *see also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007); *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988).  "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Embrey*, 849 F.2d at 421 (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).  Moreover, "[e]ven if a treating physician's opinion is controverted, the ALJ must provide specific, legitimate reasons for rejecting it." *Id.*  (citing *Cotton*, 799 F.2d at 1408).  Additionally, "[a] physician's opinion of disability 'premised to a large extent upon the claimant's own account of his symptoms and limitations' may be disregarded where those complaints have been 'properly discounted.'" *Morgan*, 169 F.3d at 602 (quoting *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (citations omitted)).  "Similarly, an ALJ may not simply reject a treating physician's opinions on the ultimate issue of disability." *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014).  "[T]he more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."  20 C.F.R. § 404.1527(c)(4).

## 2. James Derickson, M.D.

The ALJ did not have treatment records from Dr. Derickson and "[b]ased on the

lack of supportive documentation, the assessment is given little weight." AR at 28. The ALJ further found "[o]ther primary care treatment notes fail to report conditions commensurate with restrictions including standing, walking or sitting for less than two hours per day and the need to lie down at unpredictable times during the day." *Id.* "The ALJ must do more than state conclusions. [She] must set forth [her] own interpretations and explain why they, rather than the doctor's are correct." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (citations omitted). Furthermore, "[t]he ALJ is required to consider the factors set out in 20 CFR § 404.1527(c)(2)-(6) in determining how much weight to afford the treating physician's medical opinion." *Ghanim*, 763 F.3d at 1161; *Garrison*, 759 F.3d at 1012 n. 5. The ALJ did not have the opportunity to do so here, and as such, failed to set forth "specific and legitimate" reasons supported by "substantial evidence in the record" for her dismissal of Dr. Derickson's opinions. *See, e.g., Rollins*, 261 F.3d at 856.

Plaintiff met with Dr. Derickson or spoke with him on the phone more than six (6) times, during which Dr. Derickson was involved in coordinating Plaintiff's care, as well as his treatment. Plaintiff's complaints of chest pain, arm pain, and lower extremity edema were conditions consistently addressed by Dr. Derickson. Dr. Derickson noted his agreement that Plaintiff's shortness of breath derived from his cardiac issues and panic attacks. AR at 586. Dr. Derickson also recommended that Plaintiff ride a reclining bicycle for ten (10) minutes, three times per day, because Plaintiff was unable to walk long enough or enough times to really help with his circulation. As such, Dr. Derickson's care notes are consistent with his opinion regarding Plaintiff's ability to return to work.

Although the Commissioner outlines reasons that the ALJ could reject the treating physician's testimony, this Court is bound "to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking." *Bray v. Comm'r of Soc. Security Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009) (citations omitted). The Court finds it appropriate to give the ALJ the opportunity to review Dr. Derickson's records, which she did not have in the first instance.

## C. *Plaintiff's Symptoms*

### 1. Legal standard

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007). First, "a claimant who alleges disability based on subjective symptoms 'must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged[.]'" *Smolen v. Chater*, 80 F.3d 1273, 1281–82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*) (internal quotations omitted)); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014). Further, "the claimant need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen*, 80 F.3d at 1282 (citations omitted); *see also Trevizo v. Berryhill*, — F.3d —, 2017 WL 4053751, *9 (9th Cir. Sept. 14, 2017). "Nor must a claimant produce 'objective medical evidence of the

pain or fatigue itself, or the severity thereof.'"  *Garrison v. Colvin*, 759 F.3d 995, 1014

(9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1282).  "[I]f the claimant meets this first test,

and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony

about the severity of her symptoms only by offering specific, clear and convincing

reasons for doing so.'"  *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281);

*see also Burrell v. Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) (rejecting the contention

that the "clear and convincing" requirement had been excised by prior Ninth Circuit case

law).  "This is not an easy requirement to meet: 'The clear and convincing standard is the

most demanding required in Social Security cases.'"  *Garrison*, 759 F.3d at 1015

(quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

   "Factors that an ALJ may consider in weighing a claimant's credibility include

reputation for truthfulness, inconsistencies in testimony or between testimony and

conduct, daily activities, and 'unexplained, or inadequately explained, failure to seek

treatment or follow a prescribed course of treatment.'"  *Orn v. Astrue*, 495 F.3d 625, 636

(9th Cir. 2007) (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)); *see also*

*Ghanim*, 763 F.3d at 1163.  The Ninth Circuit Court of Appeals has "repeatedly warned[,

however,] that ALJs must be especially cautious in concluding that daily activities are

inconsistent with testimony about pain, because impairments that would unquestionably

preclude work and all the pressures of a workplace environment will often be consistent

with doing more than merely resting in bed all day."  *Garrison*, 759 F.3d at 1016

(citations omitted).  Furthermore, "[t]he Social Security Act does not require that

claimants be utterly incapacitated to be eligible for benefits, and many home activities

may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." *Smolen*, 80 F.3d at 1287 n. 7 (citations omitted). The Ninth Circuit Court of Appeals has noted:

> The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.

*Garrison*, 759 F.3d at 1016 (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)) (alterations in original). "While ALJs obviously must rely on examples to show why they do not believe that a claimant is credible, the data points they choose must *in fact* constitute examples of a broader development to satisfy the applicable 'clear and convincing' standard." *Id.* at 1018 (emphasis in original) (discussing mental health records specifically). "Inconsistencies between a claimant's testimony and the claimant's reported activities provide a valid reason for an adverse credibility determination. *Burrell*, 775 F.3d at 1137 (citing *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997)).

## 2. ALJ findings

Here, the ALJ acknowledged the two-step process for assessing Plaintiff's symptom testimony. AR at 25. The ALJ then found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." *Id.* at 26. The ALJ went on to review the medical record concluding "[w]ith all of the foregoing factors in mind, the

undersigned has concluded that the claimant's testimony with regard to the severity and functional consequences of his symptoms is not fully credible[.]" *Id.* at 27–28.

### a. Length of time between treatment

The ALJ acknowledged Plaintiff's "aortobifemoral bypass surgery in January 2012 while living in Missouri." *Id.* at 26. She then appears to discredit him stating, "[a]s of September 2012, the claimant had not followed up with his surgeon or cardiologist following the bypass surgery." "Failure to follow prescribed treatment may 'cast doubt on the sincerity of the claimant's pain testimony.'" *Trevizo v. Berryhill*, — F.3d —, 2017 WL 4053751, *11 (9th Cir. Sept. 14, 2017) (citing *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). A review of the record, however, shows that the ALJ's statement is incorrect. Plaintiff followed up post-operatively with his primary care physician on January 18, 2012 and then on April 9, 2012 with his cardiologist. AR at 315, 307–10. Plaintiff again saw his primary care physician on April 11, 2012. *Id.* at 306. Both doctors reported Plaintiff was struggling with his father's March 2012 suicide. On April 20, 2012, Plaintiff took leave under the FMLA because of this loss. Plaintiff then moved from Missouri to Arizona, and on September 21, 2012, saw Dr. Rosenberg to establish care. *Id.* at 359–61. Plaintiff acknowledged his need for cardiac follow-up and indicated that his failure to do so was because of "multiple personal issues." *Id.* Moreover, Plaintiff's next primary care appointment was on October 5, 2012, not May 2013 as alleged by the ALJ. In October plaintiff was concerned about swelling and a pins and needles sensation in his lower extremities. AR at 354. NP Bustamante's examination indicated bilateral lower extremity swelling up to the knee level with numbness. *Id.*

Plaintiff continued to see NP Bustamante later in October, November, and December 2012.  As such, the record does not support the ALJ's finding.

Furthermore, "[d]isability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds."  *Trevizo*, 2017 WL 4053751 at *11 (quoting *Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995)).   The record reflects that Plaintiff reported not being able to establish behavioral health care due to a lack of insurance.  AR at 354.  Any treatment gaps or lapses due to Plaintiff's inability to afford care cannot support a broader finding of unreliability.

### b. Consultative Examiner

The ALJ noted that consultative examiner Dr. Rothbaum reported that Plaintiff was able to dress and undress normally, walk normally, and get up and down from the examining table normally.  AR at 26.  Plaintiff's ability to get on and off an exam table is not a basis for discounting Plaintiff's testimony, especially in light of the well documented difficulties by Plaintiff's treating physicians.  The ALJ did not have the opportunity to review Dr. Derickson's records; however, Plaintiff's neuropathy, edema, claudication, and shortness of breath are all well documented throughout his medical records.   As such, Dr. Rothbaum's notes from a single meeting are insufficient to disregard Plaintiff's testimony. *See Trevizo*, 2017 WL 4053751 at  *11 ("clear and convincing" reasons required for crediting the opinion of an examining doctor over primary treating physician and claimant's testimony).

### c. Inconsistent statements

The ALJ noted that "the record documents a history of daily methamphetamine

abuse until 1996 . . . [and] [a]s of mid-2015, the claimant continued to use marijuana daily." AR at 27. Inconsistent or dishonest statements regarding past drug and alcohol use are proper grounds for discounting a claimant's testimony. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002). The ALJ fails to explain how having had an addiction issue 18 years ago, and Plaintiff's statements regarding his use of marijuana to treat his pain are inconsistent with the medical record. Further, there is no evidence that Plaintiff lied about or minimized his drug use. The Court finds that Plaintiff's admitted use of marijuana for pain, by itself, "does not constitute substantial evidence supporting a finding that [Plaintiff's] symptoms were not as severe as [he] testified, particularly in light of the extensive medical record objectively verifying his claims." *Trevizo*, 2017 WL 4053751, *12.

### d. Activities of daily living

The ALJ is reminded that "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." *Smolen*, 80 F.3d at 1287 n. 7 (citations omitted). Although Plaintiff may be able to manage living on his own and getting out on a daily basis, this does not necessarily equate with the ability to work. *Garrison*, 759 F.3d at 1016 (impairments that would preclude work are often consistent with doing more than spending each day in bed). Furthermore, "[o]ccasional symptom-free periods . . . are not inconsistent with disability, . . . and an ALJ may not disregard [a claimant's testimony] solely because it is not substantiated by objective medical evidence[.]" *Trevizo*, 2017

WL 4053751 at *10.

### e. Conclusion

Based upon the foregoing, the Court finds that the ALJ failed to provide specific, clear and convincing reasons for discounting Plaintiff's testimony which are supported by substantial evidence in the record. *See Lingenfelter*, 504 F.3d at 1036; *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008).

### D.    Nurse Practitioner Yurgel

Plaintiff asserts that the ALJ improperly weighed NP Yurgel's opinion. Pl.'s Opening Br. (Doc. 20) at 18–19. In giving NP Yurgel's opinion reduced weight, the ALJ pointed to the limited mental health treatment records, Plaintiff's ability to live and work on a part-time basis, and that a nurse practitioner is not an acceptable medical source. AR at 29.

As an initial matter, working ten (10) hours per week for one's mother is not exactly "working on a part-time basis." Additionally, the Ninth Circuit Court of Appeals recently opined that "[t]he Social Security regulations provide an out-dated view that consider a nurse practitioner as an 'other source.'" *Popa v. Berryhill*, — F.3d —, 2017 WL 4160041, *5 (9th Cir. Sept. 20, 2017). NP Yurgel was the only certified behavioral health treatment provider. At times this was due to Plaintiff's lack of insurance. Plaintiff's mental health issues, however, are documented throughout his medical records. Additionally, psychiatric "[d]iagnoses will always depend in part on the patient's self-report, as well as on the clinician's observations of the patient." *Buck v. Berryhill*, — F.3d —, 2017 WL 3862450, *6 (9th Cir. Sept. 5, 2017). Because the Court

will direct the ALJ to reassess her credibility findings with regard to Plaintiff, it finds that it is appropriate to direct her to reconsider NP Yurgel's statements in light of the new determination.

### E.    Remand for Further Proceedings

"'[T]he decision whether to remand the case for additional evidence or simply to award benefits is within the discretion of the court.'" *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir. 1989) (*quoting Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir. 1985)). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004) (*citing Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir. 2000)).  Conversely, remand for an award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke,* 379 F.3d at 593 (citations omitted).  Where the test is met, "we will not remand solely to allow the ALJ to make specific findings. . . . Rather, we take the relevant testimony to be established as true and remand for an award of benefits." *Id.* (citations omitted); *see also Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995).  "Even if those requirements are met, though, we retain 'flexibility' in determining the appropriate remedy." *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014).

Here, the ALJ committed legal error in rejecting Plaintiff's symptom testimony, discounting Plaintiff's treating physician's opinion.  The Court finds that remand is

appropriate in this case. The ALJ is instructed to reassess Plaintiff's symptom testimony, as well as the lay witness testimony which was discounted, in part because of the same. *See* AR at 29. The ALJ is further instructed to reassess Plaintiff's activities of daily living and the limitations that they impose based on her revised analysis of Plaintiff's symptoms. The ALJ is also instructed to reconsider Dr. Derickson's opinion in light of his additional treatment records. Additionally, the ALJ shall also reassess NP Yurgel's opinions consistent with this Order. Finally, reassessment of Plaintiff's testimony may impact the VE testimony and require additional inquiry. *See Matthews v. Shalala,* 10 F.3d 678, 681 (9th Cir. 1993) ("[i]f a vocational expert's hypothetical does not reflect all the claimant's limitations, then the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy." (internal quotation marks and citation omitted)).

## V. CONCLUSION

In light of the foregoing, the Court REVERSES the ALJ's decision and the case is REMANDED for further proceedings consistent with this decision.

Accordingly, IT IS HEREBY ORDERED that:

1)   Plaintiff's Opening Brief (Doc. 20) is GRANTED;

2)   The Commissioner's decision is REVERSED and REMANDED;

. . .

. . .

. . .

3) Upon remand, the Appeals Council will remand the case back to the ALJ on an open record; and

4) The Clerk of the Court shall enter judgment, and close its file in this matter.

Dated this 29th day of September, 2017.

Honorable Bruce G. Macdonald
United States Magistrate Judge